**Luigi SCOTTO, Libelant,**

v.

**REDERI A/B FREDERIKA, Respondent-Petitioner,**

v.

**INTERNATIONAL TERMINAL OPERATING CO., Inc., Respondent-Impleaded.**

No. 62 Civ. 2974.

United States District Court
S. D. New York.

March 18, 1966.

Alfred F. Muscio, Brooklyn, for plaintiff.

Haight, Gardner, Poor & Havens, New York City (Joseph V. Fleming, New York City, of counsel), for defendant and third-party plaintiff.

Alexander, Ash & Schwartz, New York City, for third-party defendant.

THOMAS F. MURPHY, District Judge.

Although this action by a longshoreman was brought on the theory of diversity, the plaintiff, at the beginning of trial, asked that it be considered a proceeding in admiralty and we agreed.

It involves a rather trifling injury and we suppose that plaintiff's lawyer was fearful that it might be dismissed because of the obvious failure to come within the monetary jurisdiction. It was also agreed that the issue of counsel fees by the third-party plaintiff against ITO and ITO's counterclaim for counsel fees against the plaintiff should be held

in abeyance until liability was determined.

As to the facts, it is undisputed that the plaintiff, now aged 43 and a longshoreman for 19 years, was operating one of two winches at the #3 hatch on the defendant's ship, the S.S. GUDMUNDRA, at Pier 6, Port Authority Piers, Brooklyn, New York, on June 14, 1962. Although there is some conflict as to the number of heavy cases that were taken on board in the #3 hatch by means of a crane owned by Merritt Chapman Scott (plaintiff's witnesses testifying that there were two and the chief officer of the vessel testified that there were three) and although there is some conflict as to the time of the accident (whether it was nearer 3:00 P.M. or 5:00 P.M.) it appears uncontradicted that the plaintiff was injured when a wire runner from his winch parted, during a bulling or dragging operation, striking his right cheek. Fortunately the injuries were not severe. No suturing was required and there is no scar; X rays were negative and all neurological tests were also negative. Plaintiff suffered no unconsciousness. The most plaintiff suffered was, as he claims, headache and dizziness. He was treated by Dr. Tagliagambe and other doctors on the latter's staff from the date of injury, June 14, 1962, to October 26, 1962, some 40 times. We use the word "treated" with our tongue in our cheek because we are satisfied that although he made 40 visits to the doctors' office he received little or no treatment as such but merely followed the standard compensation practice of continuous visits.

Dr. Tagliagambe advised the plaintiff that he was able to return to work on July 30, 1962, but plaintiff did not return to work until September 19, 1962, because he said he was suffering from occasional headaches and dizziness. Dr. Tagliagambe testified that the reasonable value of his and the other doctors' services was $210.

Why the wire runner parted was the principal issue as between the defendant/third-party plaintiff and the third-party defendant.

When the second (or third) heavy wooden case was lowered into the hold by the crane of Merritt Chapman Scott it was the obligation of the stevedores, i. e., the third-party defendant for whom plaintiff worked, to pull or drag it into position for stowage. The deck of the hold was covered with dunnage and greased. The two booms at the #3 hatch were spotted over it and a runner on each was controlled by a 3-ton electric driven winch. Each runner ran from the drum of the winch through a heel block and to the block at the top of the boom and then straight down the hold where each was attached to a pulling wire around the case. The pulling wires were rigged through two sets of blocks so as to be able to pull the heavy case over to the skin of the ship under the wing of the hatch.

It was the plaintiff's testimony and that of his co-workers, the operator of the other winch and the gangway man, that as soon as they put a strain on each runner, the winches operating in first gear, the runner parted near the block at the top of the boom, one part hitting the plaintiff on the cheek and the other part dropping into the hold.

The chief officer, who investigated the accident within minutes of its happening, testified that he found part of the heavy case obstructed by a raised portion of the deck used to house pipes and inferred that the runner parted because this obstruction prevented the case from moving on the greased dunnage. The third-party defendant's foreman, who was in the hold at the time of the accident, testified that the case had not moved and was not obstructed in any way.

The plaintiff, his two co-workers and the foreman each testified that the end of the runner when examined showed rust on the inside of the strands and the mate testified that he examined it and allowed that there might have been some rust spots. In any event it was not produced at trial for inspection or

examination because it was thrown overboard.

The defendant ship owner called an expert who testified that in his opinion, based upon a description of what the parted end looked like, it parted not because of any defect but rather because of the unusual strain put upon it beyond its capacity. He relied almost exclusively on the testimony of the mate that the strands on the wire rope were to a very large extent curled back and he discounted the markings of rust.

It is undisputed that a short time before the accident in question the same operation had been carried on successfully and without incident on a similar heavy draft.

The ship owner for its indemnity against the stevedore relies to a large extent on the safety regulations for longshoring promulgated by the Department of Labor, particularly 29 C.F.R. § 1504.84, and maintains that the rigging of the two booms for this pulling or drag operation was improper and in violation of that regulation.

It is its position that the runner should have proceeded from the drum of the winch to the heel block on the boom and from there to another block secured to the coaming of the hatch thus putting less strain on the runner. Thus it was a "statutory" fault to have done otherwise although the chief officer of the defendant testified that he examined the rigging and was satisfied that it was proper and efficient.

On all the evidence I am satisfied that the wire runner parted because of some internal defect and not because of the unusual strain or because the heavy case met with an obstruction and that as a result the plaintiff is entitled to recover for his injuries because such defective gear made the S.S. GUDMUNDRA unseaworthy.

I am satisfied, too, that the injuries the plaintiff sustained were very, very superficial and that he should have returned and in fact was able to work on July 30, 1962, and that his damages are limited to whatever little pain and suffering he had between June 14th and July 30, which I assess in the sum of $500 and for loss of wages during that period at the rate of $100 per week or $600.

I also find that the reasonable value of the services rendered by Dr. Tagliagambe and his associates is $100 and not $210, as he testified to, making a total of $1200 for which plaintiff is entitled to a decree.

Because I have found that the wire runner parted because of some latent defect I dismiss the third-party complaint of the defendant and dismiss as moot the counterclaim of the third-party defendant against the plaintiff and the defendant.

Let this memorandum stand for our findings of fact and conclusions of law.